# Chicago, Burlington & Quincy Railroad Company
## v.
# Henry C. Young.

*Railroads—Collision—Action by Engineer to Recover Damages for Personal Injuries—Evidence—Res Gestæ—Improper Evidence—Pleadings—Instructions—Contributory Negligence—Speed of Train—Question for Jury—Rules of Defendant—Fellow-Servants.*

1. In action by an engineer against a railroad company to recover damages for personal injuries received in jumping from his engine immediately before a collision, it is *held:* That evidence as to the character of the road at the place of the collision, its grade, the cuts through which it was constructed, the curves in the track, and the nature of the ground on each side of the road-bed, was properly admitted as part of the *res gestæ;* that evidence concerning the lack of air-brakes on the engine in charge of the plaintiff, and of the omission of a semaphore from the locality of the accident, for signaling trains, was improperly admitted, such evidence not being relevant to the issues presented by the pleadings; that there was no substantial error in the instructions; and that it is at least doubtful whether the plaintiff was, at the time of the accident, in the exercise of ordinary and due care.

2. A train dispatcher or division superintendent of a railroad company, under whose orders trains are run, is not in the same line of employment as an engineer who runs a locomotive under his orders.

3. Lacey, J., in a concurring opinion, concludes that the facts as they appear in the record do not warrant a recovery.

[Opinion filed March 1, 1888.]

Appeal from the Circuit Court of Kane County; the Hon. Isaac G. Wilson, Judge, presiding.

Messrs. A. J. Hopkins, N. J. Aldrich, F. H. Thatcher and O. F. Price, for appellant.

Messrs. Charles Wheaton and R. N. Botsford, for appellee.

Baker, J. On the 16th day of November, 1883, at thirty or forty-five minutes after twelve o'clock, noon, or at some time between those times, a freight train running "wild" from Aurora to Streator, on the Fox River branch of appel-

lant's railroad, and on which appellee was engineer, ran into a regular passenger train, also *en route* from Aurora to Streator, but which at the time of the collision was standing still upon the track, and the rear car of the passenger train was telescoped by the engine of the freight train, and a dozen or more passengers either killed or seriously injured, and property to the value of over $100,000 destroyed. Immediately before the collision, appellee jumped from his engine and received serious bodily injuries, for which he recovered in this suit, in the Circuit Court of Kane County, against the appellant corporation, as the result of a jury trial, damages to the amount of $7,000.

The place of the collision was just north of the twin bridges over Otter Creek, and was between Streator, the southern terminus of said branch road, and Richards, which was over a flag station thereon, and distant about a mile and a quarter north from the scene of the disaster.

There is in the evidence legitimate ground for argument that negligence on the part of at least four different officers or employes of the company was, to some extent, involved in the unfortunate transaction.

There is testimony tending to show that Dake, the conductor of the construction train which was stalled on the track at Otter Creek, was guilty of negligence in taking, in disregard of directions given him by the roadmaster at Streator, about double the usual number of car loads of slack to be unloaded near the twin bridges, thereby rendering it impossible for him to comply with the orders given him to be back at Streator by 12:30 P. M., and thus leave the railroad track clear before the schedule time of the regular passenger train from the north. There is also ground for the claim that the conductor of the passenger train, when his train was stopped by the construction train which blocked the track, was guilty of negligence in not acting with the promptness required, both by the rules of the company and the exigences of the circumstances which surrounded him, in immediately protecting his train and warding off the imminent danger that threatened the lives and the safety of the passengers intrusted to his safe-keeping, by sending a flagman with the danger signals

to the rear of his train.   There is also evidence tending to establish that appellee, who was engineer of the freight train that was running "wild" behind the passenger train and collided with it shortly after it came to a halt, was running at a much greater rate of speed than the rules and regulations of the company permitted it to run, or than, even in the absence of any such rules or regulations, was consistent with duty and common and ordinary care in view of the proximity of the passenger train and his knowledge of the character of the road there, the down grade, the cut, the reverse curve in the railroad track, and the hills on both sides of the road that obstructed the view, and was thereby guilty of contributory negligence.   There is also evidence of culpable negligence on the part of the train dispatcher at Aurora.   One of the rules of the company provides that when construction or other trains are working within prescribed limits, wild and extra trains must be advised of their limits, and cautioned to keep a sharp lookout for the working trains.   Another rule of the company prescribed that the superintendent, or the train dispatcher on duty, acting for and in the name of the superintendent, has full power to run any train or engine by telegraph that he may think proper.   The slack train was on the track between Streator and Richards from about half past ten in the forenoon of the day in question under orders from the train dispatcher to "work between Streator and Richards until 12:30 P. M. wild."   Then orders required the train should be back in the yards at Streator within the limits fixed, that is, by half past twelve in the afternoon.   The arrival of all trains at Streator is required to be registered by the conductor with the telegraph operator there, and by him forthwith telegraphed to the train dispatcher.   If the slack train had arrived at 12:30, it would have been necessary to have side-tracked it at a place in the yards distant some half mile north from the telegraph office, and a considerable space of time would have intervened between the time of its arrival and the receipt by the train dispatcher of a notification thereof.

In the case under inquiry, the train dispatcher, assuming all orders had been literally obeyed and that the slack train

had duly reached Streator in safety within the time limited, telegraphed to the operator at Grand Ridge, a station some five and a quarter miles north of the place where the collision occurred, "don't hold all south bound trains for orders," and this telegram was dated 12:30 P. M., and was delivered to appellee at Grand Ridge when he slowed up at that station, in response to a signal, at 12:32 P. M. The evidence is conclusive that neither the passenger train nor the freight train on which appellee was engineer, had any notification that a construction train was working between Streator and Richards. It is contended by appellant that as the right of the construction train to any part of the road between Richards and Streator expired at 12:30, the freight train which was running wild would not be notified of such construction train under the rule we have above referred to, because such latter train would have no right to the road at any time when the freight train would be on the road, between the stations to which the construction train was limited. It is urged that in such case as this, the train dispatcher must presume his orders fixing limits have been obeyed, and evidence is introduced to show it would not have been good railroading to have stopped the passenger and freight trains at Grand Ridge and retained them there until the Aurora office was notified from Streator of the return of the slack train, and that a railroad can not be successfully operated in that way. This is probably so, but no good reason is perceived why the extra freights could not and should not have been notified at Grand Ridge to look out for the construction train between Richards and Streator. We are unable to see how this would have interfered with the operators of the railroad, and it would have had the effect to put the employes on the extra train on their guard. The limits within which the construction train was working, were limits both of time and space, until 12:30 P. M., and between Richards and Streator, and it would seem the reasonable construction of the rule of the company is that all wild or extra trains should be advised of such limits before leaving the last telegraph station before reaching the prescribed limits, and cautioned to keep a sharp lookout, provided

the train dispatcher has not before then been notified the train to which the limits were given had registered, or at least was in fact clear of the limits given, both in respect to time and space. It would seem that common prudence would dictate that an extra train should not have been permitted, under the circumstances of this case, to go south of Grand Ridge without such notification, and that if it can properly be held the rule in question does not so require, then it must be regarded either that the matter of giving such notice was intrusted, without any special rule in that behalf, to the division superintendent, or to the train dispatcher, acting in his name, or that the company was guilty of negligence in not having a rule such as the exigencies of the situation demanded. The case of the C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 109, is, in its circumstances, somewhat similar to this, and is an authority that in legal principle is in point.

During the trial, the court, over the objections of appellant, permitted various witnesses to testify in regard to the character of the railroad at the place of the collision, the grade of the road, the cuts through which it was constructed, number and description of the curves in the track, and the nature of the ground on each side of the road-bed, and that it was so broken and uneven as to cut off the view for any considerable distance. It is objected that there is no change in the declaration that the railroad was improperly constructed. In our opinion that fact is wholly immaterial. We think such evidence was plainly admissible as a part of the *res gestæ*. It would be utterly impossible, properly, to understand the character of the transactions under investigation, and judge of the conduct of the several persons whose actions are supposed to have caused or contributed to the disaster, without knowledge of the matters mentioned.

Over similar objections the court allowed evidence to go to the jury that there were no air-brakes attached to the drive-wheels of the engine of the freight train; that had there been such air-brakes the train could have been stopped more easily and quickly, and that appellant had since then placed air-brakes upon freight engines. No complaint was made in the

declaration that it was the duty of the company to place air-brakes upon the locomotive or that it was guilty of culpable negligence in failing so to do. Besides this, appellee was well aware when he undertook the service of driving the engine from Aurora to Streator that there were no air-brakes attached to it. The conclusion the jury would naturally draw from this testimony is that the company was bound to furnish such air-brakes; that in not doing so it had been guilty of a breach of the duty it owed appellee, and that if these improved appliances had been furnished the collision would have either been avoided altogether, or its serious results in great part prevented. So, also, the court, over like objections, permitted appellee .to show there was no semaphore to be used to signal trains in that locality at the time of the accident, but that one had been placed there since and also to show, immediately in connection therewith, that shortly before the injury to appellee another and different accident occurred there. There was no charge in the declaration that the company was negligent in not having a semaphore at that point for the purpose of signaling approaching trains. The admission of this testimony was calculated to induce in the jury a belief that the omission to have a semaphore at that point, was culpable negligence in appellant. It is uncertain whether the verdict of the jury was predicated solely upon the charges of negligence stated in the declaration, or was based in part upon the ground the company was guilty of culpable negligence in not having provided air-brakes for the engine and in not having erected a semaphore. In view of the issue of contributory negligence which was submitted to the jury, and of the conflicting character of the testimony, the matters of the air-brakes and semaphore were of special importance. It is not unreasonable to suppose that one or both of these matters may have influenced the jury to return the verdict they did, by inducing them to believe that under all the circumstances of the case and taking into consideration the absence of air-brakes and semaphores, the negligence of appellant was gross and that of appellee slight, when compared together.

This evidence was of a character that threw no light upon

any issue involved in the pleadings and submitted to the jury for decision, and it was calculated to prejudice appellant in the minds of the jury and distract their attention from the real issues. Our conclusion is, that it was a serious error to permit it to go to the jury.

The court properly instructed the jury in the third instruction, that a train dispatcher or division superintendent of a railroad company, under whose orders trains are run, is not in the same line of employment as an engineer who runs a locomotive over such road with a train attached under the orders of such train dispatcher or division superintendent.

The point is expressly so decided in C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 109. We do not understand the case of C. & N. W. Ry. Co. v. Moranda, 108 Ill. 576, to be in conflict with that decision. In the latter case it was, under the evidence before the jury, legally admissible there might be a difference of opinion whether the section foreman and engineer or fireman were fellow-servants, and it was held that it should have been left to the jury to determine as a question of fact whether they were or not. But the division superintendent, or train dispatcher, who stands in his shoes and acts in his name, and has full control of the running of trains, stands in respect to the engineers and train conductors whose movements he directs and orders, as the representative of the master, and they are bound to regard and obey his commands as the commands of the master; there is no room for a difference of opinion in respect to the status of the parties. The other criticism made by appellant upon this instruction strikes us as trivial, and not requiring special notice. The fourth instruction contained the requirement of ordinary care on the part of appellee, and properly stated the doctrine of comparative negligence as it has been formulated by our courts. We find no error in the other instructions given for appellee. The three instructions given by the court of its own motion, were in substantial conformity with the views expressed in this opinion. The only criticism we think them subject to is, that in the form in which they were given the third might possibly have been understood by the jury as dispensing with the

necessity of ordinary care on the part of appellee. If properly read, in immediate connection with and as a continuation of the preceding instruction, it is unobjectionable, but to prevent all danger of misapprehension by the jury it would be well enough on another trial to modify it in the respect indicated.

We started out by suggesting that at the time the injuries of appellee were received, negligence on the part of the train dispatcher, the conductor of the passenger train, the conductor of the construction train and of appellee himself, as engineer of the extra or wild train, were all probably involved.

The negligence of the two conductors of trains was the negligence of fellow-servants of appellee, and appellant not chargeable therewith as between it and appellee. We have no fault to find with the finding of the jury that the train dispatcher was guilty of negligence, and that such negligence was the negligence of the railroad company. There is grave doubt from the testimony whether the company had any rule regulating the speed of wild or extra trains. There is evidence tending to show it was the usage of the company to allow such trains to run without any limitation upon their rate of speed. If the jury found there was no such rule or regulation, and that the recognized usage was as suggested, then the matter of a violation of the rules of the corporation was eliminated from the case, and it was a question of fact for the jury to determine from the evidence, whether, under all the circumstances of the particular case, appellee, in running at the rate of speed he did, was in the exercise of ordinary and due care, or, on the contrary, was guilty of negligence. The testimony was somewhat conflicting and uncertain in respect to the speed of the extra train at and immediately preceding the time of the collision. It was the province of the jury to settle the conflicts in the testimony and judge of the credibility of the several witnesses.

Were there no errors in the rulings of the court, and the issues had been fairly and fully submitted to the jury, then it would be a matter for serious consideration whether the evidence sufficiently sustained the verdict. Upon a second trial

it is probable additional light may be thrown on the matter of the rules, regulations and usage of the company, and upon the questions of controverted fact. From the evidence in the present record, we much doubt the correctness of the finding that appellee was in the exercise of ordinary and due care. In our opinion the errors of the trial court in admitting in evidence the testimony it did in regard to the absence of air-brakes and a semaphore unduly influenced the jury to the detriment of appellant, and probably occasioned the verdict which was returned. For those errors the judgment is reversed, and the cause remanded for a new trial.

*Reversed and remanded.*

Separate opinion by LACEY, J. I concur in the reversal of the judgment in this case, but not alone on the grounds stated in the opinion.

I am satisfied, from the facts as they appear in the record, there should be no recovery, for reasons to be stated hereafter. The points in the issue are stated in the opinion. 1st. Was the appellant guilty of the negligence charged in the declaration? 2d. Was the appellee guilty of such contributory negligence as to preclude a recovery? I will consider the latter issue first. The appellee charges in his declaration that he was, at the time of the injury, in the exercise of due care and caution for his own safety. In order to entitle him to recover, the burden of proof is on him to show that he was in the exercise of such care. I think he has clearly failed in this. The particulars in which I think he has failed are as follows: 1st. He disobeyed the rules of the company in running faster than at the rate of fifteen miles per hour under circumstances entirely unjustifiable. 2d. That such disobedience, of which he was guilty at the time the accident occurred, was negligence; that such negligent conduct clearly contributed to the accident. It is insisted that there was no such rule of the appellants requiring the appellee, or any other employe, to run a wild train, as this was, at a rate of speed not to exceed fifteen miles per hour. This, I think, is clearly a misapprehension. The objection that wild trains were not classified is based on the

peculiar reading of the rules printed on a card which appellee had in his possession and was running by, which classified the trains into 1st, 2d and 3d class, which were all regular trains, passenger and freight, and fixed by the rule, to wit, those having a fixed time table. The fifth rule thereon provided that " all trains which are classified on the regular time table shall be known as regular trains." "All trains not classified on the regular time table shall be known as extra or wild trains." Again, rule six fixes the speed of trains as follows: The "speed of second class trains, eighteen miles per hour; third class, fifteen miles per hour. When behind time, speed may be quickened, under favorable circumstances, for second class trains to twenty miles per hour; third class trains to eighteen miles per hour."

The interpretation that all the employes of the appellant, including the appellee himself, placed on the above rules, was that wild trains come under the rule as regards speed provided for third-class trains. This they all understood to be the rule as to the speed allowed to be made by wild trains.

And it was understood to be a violation of the rules of the company to run a wild train at a greater rate of speed than fifteen miles per hour. No less than fourteen of the present and former employes of the appellant, including the appellee himself, testified on the trial, in substance, that such was the rule as they understood it, and not a single witness contradicts it. It could make no difference whether such rule were clearly expressed in the card or not if it was so interpreted by the company, or if such were the usage of the company which the appellee understood. All appellant's servants worked by these rules as a recognized law of the company. The appellee knew that all the wild trains were governed as to speed by the speed of third-class trains; hence it would be negligence in him to run such a train at a higher rate of speed than fifteen miles per hour. I am of the opinion that the jury had no right from the evidence to find that the wild trains were not governed as to speed by such rule or usage.

Was the appellee observing this rule when the collision occurred? I think clearly not. The evidence seems to be

nearly all against him on that subject, and scarcely any for him. He does not swear, neither was the question directly asked him, that he was running his train within the rule of fifteen miles per hour when the accident occurred. He was asked on re-examination whether, if he had been running the train only at the rate of fifteen miles per hour coming down the grade and around the curve at the time he first saw the passenger coach, he could have stopped his train any better than he did. He answers he could not; that she would have gone in there anyway under the circumstances. The tenor and aim of his evidence was to offer excuses for running so fast; one excuse being that in going down from Paddy's Ridge he could not shut off steam for fear of cutting the valves. It almost amounts to a direct admission that he was violating the rules. Neither does the fireman swear that he was not running faster than the rules allowed. When we consider the circumstances and the testimony of the three men living along the line of the road between the place of the accident and Grand Ridge, and who saw the manner in which the train was running the last six miles prior to the accident, it seems to me there arises an irresistible conclusion that the train was running at least thirty miles per hour.

The passenger train from Ottawa was behind time and was running at about thirty miles per hour and the appellee's train started out some five minutes behind, yet was gaining fast on the passenger train at Richards Station, being only 80 to 100 rods behind as seen by Richards and running so rapidly and so near to the passenger train as to attract his special attention as it did the other two farmers who had just previously seen it.

There was no necessity for running his train in this reckless manner. His was a light train and could be started and stopped by him anywhere on the road. It needed no momentum to enable it to stand on and ascend any grade on the road. This cut and course was a place where it was especially necessary to observe caution. If there was any place on the road that required that the rule of the company as to speed should have been observed it was there. Other wit-

nesses testify as to the rapid rate of speed of the train at the time of the collision. No witness and no important circumstances contradict the overwhelming evidence that the train was running at a rate of speed far exceeding fifteen miles per hour, at the time immediately preceding the collision. This was negligence on the part of appellee as held by the Supreme Court in Ill. C. R. R. Co. v. Patterson, 69 Ill. 650. Can there be a doubt that such rapid rate of speed contributed to the appellee's own injury? I think not. The evidence shows that if a train be running at a rate of speed not exceeding fifteen miles per hour, there is not so great a liability of injury to an engineer jumping from it, as when it runs at a higher rate of speed. Then again, the flagman would have been far enough back to give appellee warning if he had been running at less rate of speed.

The evidence shows that the flagman was on his way to flag appellee's train after the stoppage of the passenger train and would have ample time so to do if appellee had not been wilfully violating the rules of the company. The appellee was violating another rule of the company in not keeping five minutes behind the passenger train which he must have known from the manner in which he was running, he was not doing.

The passenger train and appellee's train were in plain sight of each other at Grand Ridge and appellee must have been apprised of its position on the track. From that station he must have run faster than the passenger train. The rule that requires wild trains and others not to start out less than five minutes behind a passenger train would require, by fair construction, that such train should keep that far in the rear and, as appears from appellee's testimony, he so understood it.

It is claimed that the appellant was negligent in not notifying appellee at Grand Ridge that the gravel train had not reported and was on the track and to look out for it. If the rule should be so construed as to require such notice after the gravel train had failed to report at 12:30 o'clock we must remember that was just about the time appellee arrived at Grand Ridge, not over two minutes intervening between the time the gravel train should report and the arrival of the

appellee at Grand Ridge, and besides this it was the custom to put up the engine before reporting, which would occupy the two minutes. I think that prior to the time the gravel train was ordered to return, there was no requirement to notify appellee as his train would not go over the track where the gravel train was at work until after the time fixed for the track being clear. But, if there was negligence in this it was not wilful and the negligence of appellee would prevent recovery. There might have been negligence on the part of the conductor of the passenger train in not flagging with sufficient promptness, though this is not clear; yet the effort to flag would have been successful in saving accident had it not been for the greater negligence of appellee. This was a most terrible disaster and of all the employes of the appellant against whom negligence can be justly charged in bringing it about, it seems to me that of appellee was the most culpable. I think he may clearly trace his own misfortune to his own recklessness and his wilful disregard of the rules of the company.

I see from the evidence no habitual disregard of the rules of the company in regard to fast running that would give the appellee the right to disregard them in the manner he did. He was not hurried for time, nor was he behind time, as he had no time, being a wild train. It was not necessary to raise a grade that he should run faster than the rules allowed. He had no excuse. Especially should appellee have been cautious in turning the curve and passing through the cut in question, where he could not see what was ahead of him. Instead of using caution he rushed through the cut at a high rate of speed in wilful violation of the rules of the appellant, which he acknowledges he well understood. Under the well recognized rules of the law he can not recover.

I concur with Judge Baker in remanding the cause, as well as in the reversal of the judgment.