## LOUISVILLE, NEW ALBANY AND CHICAGO RAILWAY COMPANY *v.* HECK, ADMINISTRATOR.

[No. 17,684.   Filed June 17, 1898.   Rehearing denied Oct. 14, 1898.]

MASTER AND SERVANT.— *Personal Injuries. — Proximate Cause.* — Plaintiff's intestate was employed by defendant railway company on a work train in the capacity of fireman on a pile-driver. On the day of the accident such train was ordered to work extra at certain points on the road from 7 a. m. to 6 p. m., and on its return while running backward it collided with an extra freight train resulting in the death of intestate. Both trains were moving under the orders of defendant, and neither train had notice or knowledge of the other. Intestate was at his proper place on the work train at the time of the collision. *Held,* that defendant's negligence was the proximate cause of the death of intestate, although the work train may have violated a rule requiring it to keep a footman before and behind the train with danger signals at certain distances. *pp. 293-302.*

RAILROADS.— *Rules.—Orders.—*Where an extra freight train sent out under written orders of the superintendent was about to pass over

a portion of the division occupied by a work train, without notice of such work train, a verbal notice given by a telegraph operator that such work train was out under flag and that its orders did not concern the freight, did not amount to a modification of the written orders given.   *pp. 302-304.*

MASTER AND SERVANT.—*Vice Principal.—Railroads.*—A superintendent of a railroad division having general charge and supervision of the entire business over such division is a vice principal, and acts in the place of the master.   *pp, 304-306.*

SAME.—*Train Dispatcher.—Vice Principal.—Fellow Servant.—Railroads.*—A train dispatcher who controls and directs the movements of trains on a division of a railroad is not a fellow servant with trainmen in the employ of the railroad company, but is a vice principal, for whose negligence the company is liable.   *pp. 306-315.*

APPEAL AND ERROR.—*Record.—Available Error.*—An assignment of error based upon the action of the court in overruling demurrers to several paragraphs of complaint is unavailable where the demurrers are not in the record.   *p. 315.*

SAME.—*Assignment of Error.*—An assignment of error that the complaint does not state facts sufficient to constitute a cause of action is not available unless all of the paragraphs thereof are bad.   *p. 315.*

From the Carroll Circuit Court.   *Affirmed.*

*E. C. Field, W. S. Kinnan, Pollard & Pollard* and *G. W. Kretzinger,* for appellant.

*Michael A. Ryan, J. H. Gould* and *Joseph A. Sims,* for appellee.

McCABE, J.—The appellee, as administrator of one Aaron Heck, deceased, sued the appellant to recover damages under the statute for injuries resulting in the death of said deceased, as is alleged, by the negligence of the appellant.   A trial of the issues made resulted in a special verdict, upon which the court rendered judgment for the plaintiff.

The errors assigned, and not waived, call in question the sufficiency of the complaint, the action of the circuit court in overruling demurrers to each paragraph of the complaint and in overruling appellant's motion for a new trial, and for

judgment in its favor on the special verdict. The substance of so much of the special verdict as is material is as follows: The defendant, on and before July 6, 1891, was, and still is, a railroad corporation, owning and operating a railroad in this State, part of which is situated between and extends from the city of Lafayette, Tippecanoe county, and passing through Bloomington, Monroe county, both in Indiana; that about seven miles south of Lafayette there was at that time, and still is, a point called Taylor's Station, where there was no telegraph or freight office, but there was a side-track or switch, not being a regular station for regular trains on said road; that about thirteen and one-half miles south of Lafayette there then was, and still is, a station called Romney, at which there was a side-track and telegraph office; that a place called Raub's, ten miles, and a place called Gravellotte, two and one-half miles south of Lafayette, were flag stations, with a side-track at each, but no telegraph office, and that there was no telegraph office between Romney, and Lafayette. That on said day, the decedent, Aaron Heck, was, and for two years prior thereto, had been in the employ of defendant in the capacity of fireman on a pile-driver, that being his avocation, the engineer thereof being one R. G. Fletcher. That said pile-driver was composed of a fire engine, boiler, and other machinery resting on a flat car, was used for driving timbers into the ground in the construction and repair of bridges on said railroad. That said pile-driver car, with such other cars as were necessary, were taken from point to point over said railroad, as ordered by defendant, by a locomotive and tender, and the whole was called a "work train," and the same was not operated on schedule time, but was always an extra, moving under special orders. On said day such work

train was moved and propelled by engine No. 69, with one D. W. Myers as engineer, a fireman, and two brakemen, and S. C. Firth was conductor of said work train, and the said decedent and said Fletcher had no control or management of said work train. That, on and before said day, said railroad, for the purpose of its operation, was divided by defendant into two divisions, called the first and second divisions, the first division consisting of that part between Lafayette and Michigan City and between Indianapolis and Chicago. The second division consisted of that part lying between Lafayette and New Albany, each division being in charge of a controlling officer of the defendant, called "division superintendent," who represents the defendant company. There were subordinate employes of the defendant, all of whom were subject to the orders and control of the division superintendent. On and before said day, one James B. Safford was superintendent, and in charge of said second division, and had his office in Lafayette; that said Safford, as such superintendent, had authority from defendant for making up and sending out trains over said second division, and in that regard his authority was superior to that of any other of the employes of the defendant, and on that day he represented all movements of trains of said defendant company on said second division; that, on that morning, said work train was made up at Lafayette under the orders of said James B. Safford, as superintendent of said second division, consisting of a locomotive, tender, a flat car, said pile-driver car, and a caboose, and was ordered by said superintendent to work during that day from 7 o'clock in the morning until 6 o'clock in the afternoon, between said Lafayette and said Romney. By usage, and by the rules of the defendant, or-

ders for the movements of all trains were issued to the conductor and engineer of each train. On said day, said work train was known and designated as "Engine No. 69," being an extra train, and the order issued by said superintendent to the conductor and engineer of said work train on the morning of said day was as follows: "Supt. Office, Bloomington, July 6, 1891. For Lafayette to C. & E. of Engine 69. Engine 69 will work extra to-day, from 7 o'clock a. m. until 6 o'clock p. m. between Lafayette and Romney, protecting itself against all trains. J. B. S.;" that by said order said work train was directed to leave Lafayette at 7 a. m. of said day and be back to said city by 6 o'clock that evening; that between Lafayette and Romney said railroad was a single track, except at the way stations before mentioned, where there are side or passing tracks. Said work train left Lafayette at 7 a. m. of said day under said orders, and worked on a bridge near Taylor's Station, and continued so to work until about 5 o'clock and 35 minutes in the afternoon, when it started on its return to Lafayette, running backwards, or caboose-end foremost, at a speed of about twelve miles an hour, and at a point one and one-half miles north of said Taylor's Station, on a curve in said road, it met and collided with an extra freight train, which had been made up and sent southward over defendant's road, and over the working limits of said work train, under order of said superintendent, and which left Lafayette about 5 o'clock that afternoon. Said extra freight train was sent out under a written order from said superintendent to its conductor and engineer, of which the following is a copy: "Supt's Office, Bloomington, July 6, 1891. For Lafayette to C. &. E. of Eng. 97. Engine 97 run extra from Lafayette to Bloomington, and will meet number 44, Engine 34, at Linden.

J. B. S." That the initial letters "J. B. S." subscribed to each of said orders to said work train and to said extra freight train, were the initials of the name of said James B. Safford, and signified his name, and were so known, understood, respected, and obeyed by the conductors and engineers of said trains. No other orders were given to said work train or said extra freight train than above stated, nor was notice given to said work train that an extra freight train would be or had been sent south over its working limits, nor did the conductor or anyone on said work train know that said extra freight train was coming or was on the road. Neither the conductor nor anyone on the extra freight train had been notified by the defendant or by said superintendent, that the work train was on the road, nor had they been by the defendant or said superintendent advised of the working limits of said work train. There was a rule of the defendant company, then in force, hereinafter set out, requiring that notice should have been given by the defendant to said extra freight train of the presence of said work train on the track, within said working limits, but such notice was not in this case given. Under the order given to said work train, those in charge of it did protect it against all regular or schedule trains. The work train was running at a proper rate of speed, and the conductor and a brakeman thereof, as watchmen or lookouts, were on the forward end of the train as it ran northward and homeward, as required by appellant's rules. And that the engineer, conductor, and trainmen, in the management of extra freight No. 97, were on said day at the time of said collision, acting strictly under the orders of the defendant. That under defendant's rule 105, hereinafter set out, it was impossible for the crew in charge of said work train to protect it-

self against said extra freight train, and at the same time return to Lafayette by 6 o'clock, as was required of it. The said rule 105 was applicable to trains stopped by accident or obstructions, and was impracticable in its application to said work train at the time of said collision, because of said orders and necessity of proceeding to Lafayette on its return from Taylor's Station. That defendant, through its superintendent or otherwise, did not take any steps to give notice to those in charge of either train of the presence of the other on the line of said road. The collision occurred about 5 o'clock and 45 minutes, in the afternoon of said day; and the ground being hilly, the view of the approaching trains was obstructed so that the extra freight train could not be seen from the work train until said trains were within fifteen car lengths of each other; and the same was true as to the view from the freight, so that the men operating each train could not, after coming in view of each other, avoid the collision. At the time of said collision, the said Aaron Heck was at his proper place with said pile-driver engine on said pile-driver car, when said trains collided with great force, throwing some of the cars, including the said pile-driver car, from the track into the ditch, instantly killing said Aaron Heck. On and prior to said day, the defendant had in force the following rules and regulations for the government and control of its employes, including the movement and running of its trains. (Then follows such rules and regulations, the material ones of which will be quoted hereafter.) There were no other rules of said defendant then in force, relating to the management and movement of trains on defendant's road. That by said rules said extra freight and said work train were trains of the same class, and by said rules, on a.

single track, north-bound trains had the absolute right of track over south-bound trains of the same class. Said work train thereby had the absolute right of the track between Romney and Lafayette as against said extra freight train. The said defendant failed on said day to give a proper and sufficient order under its rules to engine 97, drawing said extra freight; and such failure was an immediate and proximate cause of said collision and death of decedent.

It is contended by the appellant that the facts found did not and do not warrant a judgment for the plaintiff, because, as is contended, those in charge of the work train were shown to have been guilty of negligence in running said work train in disobedience and in disregard of rule 105 of said company. If they did, it is conceded that such disobedience and disregard would constitute negligence such as precludes a recovery, even though the decedent had nothing to do with the negligence in running the work train, those running it being fellow servants with him of one common master in one common enterprise, unless the actionable negligence of the appellant proximately contributed to decedent's death. The appellee, however, admitting that those in charge of the work train, as shown by the verdict, failed to observe the requirements of said rule in running it, contend that said rule by no possibility could have any application to such train. They contend that it applies only to trains stopped by accident or obstruction. That rule reads thus: "When a train is stopped by accident or obstruction, the flagman must immediately go back with danger signals to stop any train moving in the same direction. At a point fifteen telegraph poles from the rear of his train, he must place one torpedo on the rail. He must then continue

to go back at least twenty telegraph poles from the rear of his train, and place two torpedoes on the rail, ten yards apart (one rail length), when he may return to a point fifteen telegraph poles from the rear of his train, and he must remain there until recalled by the whistle of his engine; but, if a passenger train is due within ten minutes, he must remain until it arrives. When he comes in, he will remove the torpedo nearest the train, but the two torpedoes must be left on the rail as a caution signal to any following train. If the accident or obstruction occurs upon a single track, and it becomes necessary to protect the front of the train, or if any other track is obstructed, the fireman must go forward and use the same precautions. If the fireman is unable to leave the engine, the front brakeman must be sent in his place."

But supposing that it did apply, and that those in charge of the work train violated rule 105 in failing to travel seven miles home from Taylor's Station slow enough to keep a footman before and behind walking, still appellee contends that that would not defeat a recovery. It must be conceded that if that was a violation of rule 105 on the part of those in control of the train, in which the verdict shows the decedent had no part, still, they being fellow servants with him, there can be no recovery if that negligence of his fellow servants was the sole proximate cause of the collision and death. It is contended, however, that such negligence, if it be negligence, was not, as shown by the verdict, the sole proximate cause of the collision and death. It is contended that the verdict shows that appellant's negligence in sending out the extra freight, in violation of its own rules, was at least one proximate cause of the collision and death. The system of rules adopted by a master for the conduct of a complicated business,

such as operating a railroad, when brought to the knowledge of the employe, form a part of the contract of hiring, and become binding on both master and servant. The violation thereof, to the injury of the servant by the master, is as much an act of negligence as if the servant violates them. *Pennsylvania Co.* v. *Whitcomb,* 111 Ind. 212-219, and cases there cited; *Louisville, etc., R. W. Co.* v. *Frawley,* 110 Ind. 18-25; *Matchett* v. *Cincinnati, etc., R. W. Co.,* 132 Ind. 334-341; Wharton Neg., sections 205-233.

Here one of appellant's own regulations wisely provided that "when an order has been given to work between designated points, no other extra must be authorized to run over that part of the track without provision for passing the work train." But an order was given by the appellant to the extra freight, in violation of this provision, to run over the working limits designated in the order to the work train, without any provision for passing the work train. But it may be insisted that the appellant did not know, at the time the order to the work train was given in the morning, that the necessity of sending out the extra freight in the afternoon would arise. If that be so, then another provision of appellant's regulations provided for such a contingency, as follows: "When the movement of an extra train over the working limits cannot be anticipated by these or other orders to the work train, an order must be given to such extra to protect itself against the work train in the following form: (e) Extra 76 will protect itself against work train extra 95 between Lyons and Paris." But it is not claimed or pretended that this regulation was complied with. On the contrary, it clearly appears that both of these regulations were violated in sending out the extra freight. Another regulation applicable to the conditions shown to ex-

ist by the verdict requires that, "when an extra receives orders to run over working limits, it must be advised that the work train is within those limits by adding to example 'a' the words—'(g) Engine 292 is working as an extra between Berne and Turin.' A train receiving this order must run expecting to find the work train within the limits named." This regulation was left totally uncomplied with, and was violated by the appellant in sending out the extra freight. These several violations of its own rules, established by appellant presumably for the security and safety of its employes, as well as the protection of its own property, was negligence on appellant's part, and was a proximate cause of, and without which the collision and death resulting therefrom, would not have occurred. *Boyce* v. *Fitzpatrick*, 80 Ind. 526; *Louisville, etc., R. W. Co.* v. *Berkey*, 136 Ind. 181, 188, and authorities there cited; *Coppins* v. *New York, etc., R. R. Co.*, 122 N. Y. 557; Beach on Cont. Neg., section 304; *Cincinnati, etc., R. W. Co.* v. *Lang*, 118 Ind. 579; *Rogers* v. *Leyden*, 127 Ind. 50; *Cleveland, etc., R. W. Co.* v. *Wynant*, 134 Ind. 681.

The appellant, however, contends that its motion for a new trial ought to have been granted, because the evidence does not support the special verdict, in that such evidence shows that appellant did not violate its rules in sending out the extra freight without notice of the presence of the work train within the working limits designated in the order to it. This contention is founded on the testimony of Mr. Rudesall, the engineer of the extra freight, as follows: "Before starting your train out on that evening, on the 6th day of July, 1891, did you receive any further notice from the operator there that the work train was working south of Lafayette? Ans. After we got our orders, we went back up stairs, and asked

him if there was not a work train out; they said that there was, but it didn't concern us, they were under a flag. Q. State to the jury what the operator told you. Ans. He said they were out, but their orders didn't concern us—that they were under a flag." To determine the force and significance of this information, another regulation and rule (153), found in the book of rules, must be looked to. That rule reads thus: "A train or any section of a train must be governed strictly by the terms of orders addressed to it, and must not assume rights not conferred by such orders. In all other respects it must be governed by train rules and time tables." This notification was not an order, the operator having no power or authority to give orders himself, or to change or modify those issued by the train dispatcher in the name of the superintendent, and was in no sense a modification of the written order given to the extra freight. On the contrary, it amounted to a direction to run over the working limits, regardless of the work train, precisely as if previous orders had been given to the work train to clear the track for the extra freight. The regulation mentioned reads thus: "When it is anticipated that a work train may be where it cannot be reached for meeting or passing orders, it may be directed to report for orders at a given time and place, or an order may be given that it shall clear the track for a designated extra in the following form;" and then follows the form of the order. From the notification given the extra freight, those in charge of it had a right to suppose that some such order had been given to the work train; and therefore, and in any event, the extra freight was, under appellant's rules, bound to run in strict accordance with its written order. This is so because rule 113 provides that, "all messages

or orders respecting the movement of trains   *   *   *
must be in writing." And rule 115 provides that "ex-
tra trains must not be run without an order from
the superintendent of transportation." And even the
notification, as well as the strict terms of the writ-
ten order, required it to run just as if the work train
was not out, or, if out, was on a side-track to let the
extra freight pass. Therefore those in charge of the
extra freight were not guilty of negligence in run-
ning, as they did, in strict compliance with their
orders; but those orders were wrong, and their issue
was an act of negligence, and this evidence is in no
way inconsistent with the finding in the special ver-
dict. Therefore the evidence well supports the spe-
cial verdict, that the order issued to the extra freight
was an improper one, and ought not to have been is-
sued under appellant's rules, but that quite a differ-
ent one should have been issued.

But appellant contends that the evidence does not
support, and is contrary to the finding in the special
verdict in another respect. And that is that it does
not show or prove that the appellant company gave
the erroneous and improper order to the extra
freight, or failed to give the proper order. The evi-
dence shows that one James B. Safford was the su-
perintendent of the second division of appellant's
road, extending from Lafayette to New Albany, and
that his office was in Lafayette; that he had general
charge and supervision of appellant's entire business
over that division of the road, and the control of the
movement of all trains passing over that division;
that its train dispatcher was located at Bloomington,
about 100 miles south of Lafayette on its road; that
the rules of the appellant required that all orders for
the movement of trains over that division should be
issued in the name and under the authority and di-

rection of the superintendent of such division, but should be issued by the train dispatcher, who was authorized to sign the initials "J. B. S." to such orders. Those initials, by the rules and regulations, meant, and were intended to mean, the name, "James B. Safford," who was superintendent; and orders and messages so signed, and sent by telegraph by the appellant's train dispatcher, were required, by the rules and regulations of appellant to be obeyed and respected as the order of the said division superintendent, and said initials as his name; and such orders and messages so signed by said train dispatcher with said initials, were by all employes and operatives of appellant on said division treated, respected, and obeyed as the orders of said superintendent, James B. Safford; and said initials signed to such orders and messages were by said operatives, under said rules, treated, respected, and obeyed as the genuine signature of said superintendent, and the genuine order of said superintendent, James B. Safford. But, as a matter of fact, the orders here involved, as well as all orders for the movement of trains over the appellant's road or that division of it, were and are issued and telegraphed to the points to which they are applicable by the train dispatcher at Bloomington. It is not denied by appellant that the superintendent was a vice principal, acting for and representing the appellant. But appellant's contention is that the orders involved here were not in fact issued by such superintendent, and were therefore not his acts. If the appellant company could by any possibility, by its rules, orders, and regulations, make the acts of the train dispatcher the acts of its superintendent, the evidence clearly shows that that has been done. On general principles, it would seem that

a division superintendent clothed with the powers and charged with the duties with which James B. Safford was clothed and charged, as appears by the evidence, was a vice principal, represented and acted in the place of the master, the appellant. *Taylor* v. *Evansville, etc., R. R. Co.*, 121 Ind. 124; *Krueger* v. *Louisville, etc., R. W. Co.*, 111 Ind. 51; *Patterson* v. *Pittsburg, etc., R. R. Co.*, 76 Pa. St. 389.

As said by Wharton on Neg., section 232: "The true view is, that, as the corporation can act only through superintending officers, the negligences of those officers, in respect to other servants, are the negligences of the corporation." And, as is said in section 235, " 'If a master employs experienced workmen, and directs them to act under the superintendence and to obey orders of a deputy whom he puts in his place, they are not engaged in a common work with the superintendent,' and the master is liable for the superintendent's negligence. And this is eminently the case with corporations, which can only act through agents, general and special."

The question still remains whether the negligent act of the train dispatcher in sending out the extra freight with a wrong order, and without a proper order, was the act of the superintendent. If the attempt here was to hold the superintendent personally liable for the negligence of the train dispatcher, we should have a very different question. But that is not the case. It is sought to hold the master liable, because by its rules, it made the train dispatcher's act the act and order of its superintendent or vice principal. By those rules it gave such act all the force, vigor, and effect as to its other employes as if the train dispatcher's act was actually the act of its superintendent. Under such circumstances, it would hardly seem consistent for the master to turn around after

Louisville, etc., R. W. Co. v. Heck, Admr.

such act brings fatal consequences, and say to the same employes that the acts of the train dispatcher were not in fact the acts of the superintendent, though my rules said they were.

But assuming, as appellant's learned counsel do, that the train dispatcher's acts were not those of the division superintendent, it does not follow, as they contend, that the negligence of the train dispatcher was the negligence of a fellow servant with the decedent, thereby defeating a recovery. In the wide range of decided cases, both in this country and England, on this subject, the industry of the learned counsel for the appellant have only been able to cite two cases in support of their contention that a train dispatcher is a fellow servant with trainmen. Those cases are *Robertson* v. *Terre Haute, etc., R. R. Co.,* 78 Ind. 77, 41 Am. Rep. 552, and *Oregon, etc., R. W. Co.* v. *Frost,* 74 Fed. 965.

The Indiana case, as is shown by the learned counsel, does not seem very satisfactory. Especially as this court has since announced general principles of law pertinent to the point at total variance with that case, to which reference will hereafter be made. The opinion announces that a train dispatcher and a brakeman on a train in the employ of the railroad company were fellow servants, and therefore the negligence of the train dispatcher in failing to send proper orders to one of the trains involved, to sidetrack at a certain station, caused them to collide, injuring the plaintiff, who was a brakeman on one of the trains. Whether a train dispatcher or any other agent or employe of a railroad company is a fellow servant with other employes or is a vice principal, must depend, not upon his superior authority, rank, or station, but must depend upon the nature of the duties the master has charged him with, or the power·

and authority with which the master has clothed him. As was said in *Indiana, etc., R. W. Co.* v. *Snyder*, 140 Ind., at p. 653: "Where the duty is one owing by the master, and he entrusts it to the performance of a servant or agent, the negligence of such servant or agent is the negligence of the master. As the master is charged with the duty of providing safe and suitable appliances, if he entrusts such duty to an employe, such employe becomes a vice principal, and his negligence in such matter is the negligence of the master. The rule which absolves the master from liability on account of the negligence of a fellow servant has no application." Citing to the same effect, *Indiana Car Co.* v *Parker*, 100 Ind. 181; *Krueger* v. *Louisville, etc., R. W. Co.*, 111 Ind. 51; *Louisville, etc., R. W. Co.* v. *Buck, Admr.*, 116 Ind. 566; *Brazil, etc., Coal Co.* v. *Young*, 117 Ind. 520; *Cincinnati, etc., R. R. Co.* v. *McMullen*, 117 Ind. 439; *Taylor* v. *Evansville, etc., R. R. Co.*, 121 Ind. 124. And we add the following cases to the same effect: *Ohio, etc., R. W. Co.* v. *Stien*, 140 Ind. 61, and cases there cited; *Robertson* v. *Chicago, etc., R. R. Co.*, 146 Ind. 486; *Louisville, etc., R. W. Co.* v. *Berkey, Admr.*, 136 Ind. 181. There is not a word said in *Robertson* v. *Terre Haute, etc., R. R. Co.* above cited, why the train dispatcher in that case was a fellow servant with the injured brakeman on a train; nor is there any reference to any evidence showing the nature of the duties the train dispatcher was required to perform. Without some facts presented to the court, either by pleading or evidence, to show what the nature of the duties devolving on the train dispatcher were, there was no basis for the legal conclusion that he was a fellow servant with a brakeman. As is said by Wharton on Negligence, section 230: "But whether an employment is common to the injuring and the injured employe is a

question of fact and not of law." From the face of the report in *Robertson* v. *Terre Haute, etc., R. R. Co.*, *supra*, it would seem that the writer of the opinion proceeded upon the theory that whether a train dispatcher was a fellow servant or a vice principal was an unmixed question of law. Therefore we have examined the original record in that case, and find no such question as to whether the train dispatcher was a fellow servant with the injured brakeman or a vice principal of the railroad was involved or presented by the record in that case. At the close of the plaintiff's evidence, the defendant railroad company demurred to the evidence for insufficiency to make a case or sustain the complaint. The whole evidence is properly set out in the demurrer, and there is not one scintilla of evidence as to what the duties of the train dispatcher were; nor is there a particle of evidence that such train dispatcher had been guilty of any negligence, or that he had left undone anything that duty required him to do, or that he had negligently or imperfectly performed any duty or service whatever in relation to the operation of the railroad in that case. Therefore the remarks of the learned commissioner in writing the opinion in that case, to the effect that the train dispatcher was a fellow servant with the injured brakeman, were wholly *obiter dicta*, and no authority whatever. That question was treated as an open question by this court in *Evansville, etc., R. R. Co.* v. *Tohill*, 143 Ind., at p. 57, in saying: "Not conceding that the complaint sufficiently alleges that the collision was due proximately to the negligence of the train dispatcher, and not deciding whether the train dispatcher and the deceased were fellow servants, we will proceed to examine the special verdict, upon the appellee's contention that it finds that the collision was due to the negligence of

the train dispatcher." Therefore, we feel warranted in saying that the question is an open one in this State up to this time. Hence it is not so surprising that appellant's counsel would try to support the *dictum* in *Robertson* v. *Terre Haute, etc., R. R. Co., supra,* by authority from outside of our State. But the one single case cited by them for that purpose is far more against, than for their contention. That case, *Oregon, etc., R. W. Co.* v. *Frost,* already named above, was by the Circuit Court of Appeals of the United States for the ninth circuit. That court said: "It is conceded that the train dispatcher, in giving notice of a change in the running of trains, acts for and in behalf of the railroad company. He is in that respect a vice principal, not because of his attitude to other employes as their superior, nor because he has charge of a department, but because of the nature of the duty which he discharges. He is, for the time being, clothed with the responsibility which rests upon the company to furnish its employes a safe place of operation. The ordinary running of a train is established by a fixed schedule, of which all operatives have notice, and by which their acts must be governed. When occasion arises to disturb the regular schedule, the duty rests upon the company to give timely notice to those that are to be affected thereby. This it is the office of the train dispatcher to do."

There must be in all the boundless fields of adjudication on the subject an ominous dearth of authority supporting appellant's contention, or its learned counsel would not have felt constrained to offer for that purpose such authority as that just quoted. In that case, however, it was held that the failure of the operator to whom the train dispatcher transmitted it by wire to deliver the order to the proper train was the negligence of a fellow servant

with the engineer on the train to whom the order was addressed by the train dispatcher. But even that holding was by a divided court. On the other point it was unanimous. The holding of this case on the question as to whether a train dispatcher is a fellow servant with trainmen, or a vice principal, under the facts there disclosed, from the nature of his duties, is strictly in harmony with the numerous cases in this court already cited above, holding that any servant or agent who performs duties owing by the master to his servants is not a fellow servant of such other servants, but acts for and in the place of the master, and as to such acts is a vice principal, regardless of his rank, power, or authority.

Let us see, then, what duties are devolved by law on the master in cases of this kind, and with what duties the train dispatcher was charged, and with what power he had been clothed by the master? Rule 190 requires him to "issue orders for the movement of trains in the name of the trainmaster, and must use care in sending telegraphic orders." Rule 192 requires that he "must see that a correct register is kept of every train that passes each telegraph office, and that the train orders are properly recorded and filed for reference." Rule 193 requires that he "must see that train orders are transmitted in the manner and form prescribed." Rule 196 provides that, as far as practicable, he "must notify the telegraph operators and conductors and enginemen of all trains running in either direction, of any extra trains on the road and their destination." Rule 199 provides that he "must not go off duty until relieved by another train dispatcher, to whom they (he) must explain the train orders outstanding, in writing, in ink, in a book kept for that purpose, and give any other information that may be necessary for his guid-

ance.    Relieving dispatcher must acknowledge his understanding in writing of all outstanding orders before going to work." The other findings and evidence show that all train orders were issued by the train dispatcher, and that he absolutely controlled all their movements; and especially and particularly he was charged with the duty of so ordering their movements as to avoid collisions, though he did this all in the name of the superintendent, under the rules of the company. This was a duty the master owed to its servants engaged in running and operating said trains. As was said by this court in *Evansville, etc., R. R. Co.* v. *Tohill, supra,* "We think it may be conceded to be the law that a railroad company operating a complicated system of trains is required to provide for the reasonable safety of operatives of such trains. * * * There are many authorities to the proposition that it is the duty of a railroad company to use ordinary care and prudence in making and promulgating reasonably necessary and sufficient rules for the safe running of its trains, and for the government of its employes, so as to furnish them a reasonable degree of safety, taking into consideration the nature of the service," citing a long list of cases. Accordingly, Wharton on Negligence, section 233, says: "The master of men in dangerous occupations * * * is bound to provide for their safety."

A railroad company is legally bound to know, and therefore, in law, it does know, the whereabouts of all its trains. As was said by this court in *State* v. *Indiana, etc., R. R. Co.,* 133 Ind., pp. 77, 81, 82: "The court judicially knows that telegraph lines are maintained, operated, and used in connection with railroads, and that it is necessary to do so to operate properly a railroad, and give advice as to the time of running trains, and the arrival of them at certain

points along the line, and in directing the running of trains, and transacting the business of the road; that the telegraph is generally used, and is necessary, in connection with a proper system, in operating a railroad. * * * The company * * * operates the whole line of road. It is present at every point along the line by its officers and servants. It knows at all times where its trains are." This knowledge it can only have through its train dispatcher. If there are any duties devolving upon a railroad employe, servant, or agent, from the president down, more sacredly and imperatively due from employer to employes than others, we can think of none more imperative or more sacred than the duty so to order the running of trains in a complicated system of freight and passenger transportation both ways over a single track railroad, as was the case here, with numerous extra trains, as that collisions between opposing trains, entailing such fearful loss of life, limb, and property, may be avoided. No duty that the company can owe to its servants can be higher or more imperative than this. And this was the duty and power that the appellant had delegated to its train dispatcher to do and perform in the name of its superintendent. Whether the failure properly to discharge this duty was the negligence of the train dispatcher or superintendent can make no difference, because in either case it was a duty the master owed, and hence the failure and neglect was the master's failure and neglect, to the injury of its servant.

The overwhelming weight of authority is to the effect that a train dispatcher who controls and directs the movements of trains, as was the case here, is not a fellow servant of trainmen, but is a vice principal. In very many of the cases cited below the train dispatcher issued the orders in the name of the

division superintendent. In addition to the case in *Oregon, etc., R. W. Co.* v. *Frost, supra,* we cite: *Little Rock, etc., R. R. Co.* v. *Barry,* 58 Ark. 198, 23 S. W. 1097, 25 L. R. A. 386; *McKune* v. *California, etc., R. R. Co.,* 66 Cal. 302, 5 Pac. 482; *Darrigan* v. *New York, etc., R. R. Co.,* 52 Conn. 285, 52 Am. Rep. 590; *Chicago, etc., R. R. Co.* v. *Young,* 26 Ill. App. 115; *Chicago, etc., R. R. Co.* v. *McLallen,* 84 Ill. 109; *Hannibal, etc., R. R. Co.* v. *Kanaley,* 39 Kan. 1, 17 Pac. 324; *McLeod* v. *Ginther,* 80 Ken. 399; *Lasky* v. *Canadian, etc., R. W. Co.,* 83 Me. 461, 22 Atl. 367; *Hunn* v. *Michigan, etc., R. R. Co.,* 78 Mich. 513, 44 N. W. 502, 7 L. R. A. 500; *Smith* v. *Wabash, etc., R. W. Co.,* 92 Mo. 359, 4 S. W. 129; *McChesney* v. *Panama R. R. Co.,* 21 N. Y. Supp. 207; *Hankins* v. *New York, etc., R. W. Co.,* 142 N. Y. 416, 37 N. E. 466; *Sheehan* v. *New York, etc., R. R. Co.,* 91 N. Y. 332; *Lewis* v. *Seifert,* 116 Pa. St. 628; *Washburn* v. *Nashville, etc., R. R. Co.,* 3 Head. 638, 75 Am. Dec. 784; *Galveston, etc., R. W. Co.* v. *Arispe,* 5 Tex. Civ. App. 611, 23 S. W. 928; *Phillips* v. *Chicago, etc., R. W. Co.,* 64 Wis. 475, 25 N. W. 544; *Crew* v. *St. Louis, etc., R. W. Co.,* 20 Fed. 87; *Cincinnati, etc., R. R. Co.* v. *Clark,* 57 Fed. 125; *Dana* v. *New York, etc., R. R. Co.,* 92 N. Y. 639; *Chicago, etc., R. W. Co.* v. *Ross,* 112 U. S. 377. The contrary is held to be the law in Mississippi and in Maryland in a qualified form. So that we are safe in saying that the overwhelming weight of judicial opinion is that a train dispatcher, charged with the duties and clothed with the powers that the one now in question was, is not a fellow servant with trainmen in the employ of the railroad company, but is a vice principal for whose negligence the company is liable. And that being in harmony with principles of law long established in this court, we are of opinion

that the train dispatcher in this case, being charged with the performance of duties the master owed to its other servants, its trainmen, he was not a fellow servant with them, but acted for and in the place of the appellant company, and was a vice principal. The finding, therefore, in the special verdict, that the master, the appellant, did the negligent acts, and was guilty of the negligent omissions of duty, was well supported by the evidence. Therefore, even if the decedent's fellow servants in charge of the work train were guilty of negligence in not complying with rule 105 in running the same, the appellant was still liable, because its negligence in sending out the extra freight in violation of its rules was, at least, a joint, concurring, proximate cause with that of those running the work train, in producing the collision and death. It is settled law that the master is liable for the joint negligence of himself and the co-employe of the person injured. Beach Cont. Neg., section 304; *Cincinnati, etc., R. W. Co.* v. *Lang, supra; Rogers* v. *Leyden, supra; Cleveland, etc., R. W. Co.* v. *Wynant, supra.* Therefore there was no error in overruling appellant's motion for judgment in its favor on the special verdict.

The error assigned on the action of the court in overruling the several demurrers to the several paragraphs of the complaint is unavailable, because the demurrers are not in the record. It is not contended, under the assignment that the complaint does not state facts sufficient to constitute a cause of action, that all the paragraphs are bad; and such an assignment is unavailable unless they are all bad. But there is no substantial or tangible objection made in appellant's brief to any of the paragraphs. We conclude that there was no error in overruling the motion for a new trial and rendering judgment on the verdict. The judgment is affirmed.